IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TODD COYER, *et al.*, | Case No.: 1:22-cv-00362 |
| Plaintiffs, | |
| v. | |
| UNIVAR SOLUTIONS USA INC., *et al.*, | |
| Defendants. | April 26, 2022 |

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiffs, Todd Coyer, Karl Kisner, Lauryn Overbey, Lisa Solomon, and Sonny Pike, (collectively, "Plaintiffs"), respectfully submit this Memorandum of Law in Opposition to Defendants' Motion ("Motion") to Dismiss the Class Action Complaint ("Complaint" or "CAC") and their supporting Memorandum of Law ("Memorandum" or "Memo.").[1]

Despite Defendants' attempt to confuse and misconstrue the allegations in the Complaint, Plaintiffs state more than sufficient factual allegations from which the Court can infer that Defendants breached fiduciary duties owed to the Plan. The Court should not be misled by Defendants' attempted misdirection.

## I. BACKGROUND

### A. Plaintiffs, Defendants, And The Plan Structure

Plaintiffs are former participants in the Univar Solutions 401(k) Plan ("Plan"), a qualified tax-deferred defined contribution retirement plan. CAC at ¶¶ 2, 9-13. The Plan is one of the largest 401(k) plans in the United States, with 7,449 participants and assets totaling over $978 million by the end of 2020. *Id* at ¶ 4 (citation omitted). Plans with such substantial assets have significant bargaining power and the ability to demand low-cost administrative and investment management services in the marketplace. *Id*.

Univar is the Plan sponsor and a fiduciary charged with administering the Plan. *Id* at ¶¶ 5, 14. The Board and its members assembled the Administrative Committee and appointed the Committee members to administer the Plan on Univar's behalf, all of whom are also fiduciaries of then Plan. *Id* at ¶¶ 15-17. Defendants contracted with the Fidelity Management Trust

---

[1] "Defendants" refers collectively to Univar Solutions USA, Inc. ("Univar"), the Board of Directors of Univar Solutions USA, Inc. ("Board"), and the Retirement Plan Committee of Univar Solutions USA, Inc. ("Administrative Committee" or "Committee"). Capitalized terms not otherwise defined herein shall have the same meaning as in the Complaint.

Company (together with affiliated entities, "Fidelity") to serve as the Plan trustee, holding Plan assets in trust and performing all investments and asset allocations for the Plan. *Id* at ¶ 25. The Plan pays its expenses from Plan assets, generally as a reduction of participants' investment income. *Id* at ¶ 22.

### B. Plaintiffs' Claims and Supporting Facts

Plaintiffs assert three claims: (1) that Defendants failed to fully disclose the expenses and risk of the Plan's investment options to participants; (2) that Defendants allowed unreasonable expenses to be charged to participants; and (3) that Defendants selected, retained, and/or otherwise ratified high-cost and poorly-performing investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time Defendants selected and retained the funds at issue and throughout the Class Period.

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). An ERISA fiduciary has a duty of prudence, which requires that he or she act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Daugherty v. Univ. of Chicago*, 2017 WL 4227942, at *8 (N.D. Ill. Sept. 22, 2017) (quoting 29 U.S.C. § 1104(a)(1)(B)). ERISA fiduciaries also have a duty of loyalty, which requires that a fiduciary "'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries' and 'for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan[.]'" Id. (quoting 29 U.S.C. § 1104(a)(1)(A)). As fiduciaries who manage the Plan, Defendants have "a continuing duty—separate and apart from the duty to

exercise prudence [and loyalty] in selecting investments at the outset—to monitor, and remove imprudent, trust investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).

During the Class Period, a significant portion of the Plan's assets were invested in the Fidelity Freedom funds target date suite (the "Active Suite") (in large part because Defendants selected the suite as the Plan's Qualified Default Investment Alternative). *Id*. at ¶¶ 65-76. Offered in the Plan since at least December 2009, the Active Suite is riskier and more expensive than its index fund counterpart, the Fidelity Freedom Index funds ("Index Suite"), with which it shares the same investment management company and investment managers, and almost the same equity glide path (*i.e.*, allocation strategy). *Id*. at ¶¶ 62, 64, 67, 69. In 2013 and 2014, the Active Suite underwent a strategy overhaul, authorizing the investment managers to deviate from the glide path allocations by 10% and increase exposure to market volatility. *Id*. at ¶¶ 75-76. Since the strategy overhaul, the Active Suite has consistently underperformed several of the most popular readily investable alternatives in the TDF marketplace. *Id*. at ¶¶ 80-82. The strategy overhaul and subsequent underperformance did not go unnoticed by the investing public, including other 401(k) plans, as evidenced by the $16 billion in net outflows the Active Suite suffered from 2014 to 2018. *Id*. at ¶79. Nonetheless, Defendants retained -- and, by all indications, never considered removing -- the Active Suite.

From the start of the Class Period through at least December 31, 2018, Defendants also allowed the Plan to be charged total amounts of recordkeeping and administrative ("RK&A") services fees that far exceeded the reasonable market rate. The RK&A services provided to the Plan are and were the same standard services provided to all large defined contribution plans, like the Plan. *Id*. at ¶52. Fidelity did not provide any services to the Plan that were unusual or

out of the ordinary. Regardless, for large plans like the Plan, any differences in services are immaterial to pricing considerations, the primary drivers of which are the number of participant accounts and whether plan fiduciaries solicited competitive bids to determine the reasonable market rate for the services required. *Id*. at ¶47.

## II. ARGUMENT

### A. Standard of Review

ERISA's duty of prudence requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The standard applies to both the initial selection of an investment and the continuous monitoring of investments to remove imprudent ones. *Tibble*, 135 S. Ct. at 1828-29. A breach of the fiduciary duty of prudence may be alleged with circumstantial facts, as Plaintiffs have comprehensively done here.

In order to survive a motion to dismiss, a complaint must simply plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, at 570 (2007). The Court should "construe the complaint in the light most favorable to plaintiff, accept all well-plead facts as true, and draw reasonable inferences in plaintiff's favor." *Taha v. Int'l Bhd. Of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020) (citing *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013)).

Courts evaluating ERISA breach of fiduciary duty claims must perform a context-specific inquiry, consistent with *Tibble*'s guidance regarding ERISA "fiduciaries' continuing duty to monitor all plan investments and service arrangements and remove imprudent ones." *Hughes v. Northwestern University*, 142 S. Ct. 737, 738 (2022) (citing *Tibble*, 135 S. Ct. 1823).

### B. Plaintiffs State Claims That Defendants Breached Their Fiduciary Duties

Defendants' framing of Plaintiffs' claims for breach of fiduciary duty as outcome-based, rather than process-based, completely misconstrues the well-plead allegations in the Complaint. Defendants urge this Court to adopt a pleading standard requiring Plaintiffs to plead specific facts regarding the decision-making process, relying on *Divane v. Northwestern Univ.*, 953 F.3d 980, 989-91 (7th Cir. 2020), *vacated and remanded sub nom. Hughes v. Northwestern Univ.*, 142 S.Ct. 737 (2022); Memo. at 4. However, in *Hughes,* the Supreme Court recognized that the *Divane* court applied too strict a pleading standard, which it noted was inconsistent with the context-specific inquiry required by ERISA, and failed "to take into account respondents' duty to monitor all plan investments and remove any imprudent ones," as articulated in *Tibble*. *Hughes*, 142 S. Ct. at 740. As the Supreme Court noted in *Tibble*, a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Tibble*, 135 S. Ct. at 1828-29.

ERISA plaintiffs are not required to plead their breach of fiduciary claims with a degree of precision only possible after review of deliberative information only in the possession of the plan fiduciaries. *See Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016). Instead, a claim alleging a breach of fiduciary duty may survive a motion to dismiss if the court, based on circumstantial factual allegations, "from which a factfinder could infer that the process was inadequate." *Id*. "This is particularly true in ERISA cases because 'ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.'" *Id.* (quoting *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 601 n.10 (8th Cir. 2009)).

Plaintiffs' allegations, taken together, are straightforward "circumstantial facts" establishing that Defendants employed a flawed process that failed to adequately consider warning signs associated with the Plan's investments. *See Kruger v. Novant Health*, Inc., 131 F. Supp. 3d 470, 476 (M.D.N.C. 2015). As discussed below, Plaintiffs have provided meaningful benchmarks for comparison, which provide sufficient circumstantial facts to support the inference that, in light of the information that was available to Defendants throughout the Class Period, their retention of the Active Suite during the Class Period was unreasonable.

> **1. Plaintiffs Plausibly Allege that Defendants Caused the Plan to Pay Excessive Recordkeeping and Administrative Fees**

Defendants suggest that Plaintiffs fail to provide a like-to-like comparison or to show a disparity sufficient to suggest a deficient decision-making process. Memo. at 5-6. This argument is based entirely on a misstatement of the record and the creative misapplication of legal authorities. Turning once again to *Divane* for support, Defendants argue that the fees charged to participants during the Class Period are reasonable. However, *Divane* is readily distinguishable, as the district court there granted dismissal of the complaint after more than one year of discovery and found the recordkeeping arrangement justified by special circumstances, including product access and termination penalties, while there has been no discovery in this case and there is no sufficient justification for the overpayment. 953 F.3d at 984, 986. The plan in *Divane* had a unique arrangement under which it utilized two separate recordkeepers, enabling the plan to continue to offer funds with a lower surrender charge to its participants. *Id*. No such circumstance, or indeed any analogous situation, is present here. Defendants also cite to *Martin v. CareerBuilder, LLC*, 2020 WL 3578022, at *4 (N.D. Ill. July 1, 2020), and *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018), to suggest that Plaintiffs must do more than

point to less expensive alternatives with some similarity to provide a benchmark. Despite Defendants' unsupported suggestion to the contrary, Plaintiffs provide just that.

Plaintiffs' well-plead allegations demonstrate that Defendants caused the Plan to pay grossly excessive fees for services they could have obtained at a fraction of the price. This conduct clearly falls short ERISA's duty of prudence. *See* 29 U.S.C. § 1104(a)(1)(B). Plaintiffs provide meaningful comparator plans, all with a similar number of participants. CAC at ¶¶ 56-60. Some of these plans used Fidelity as their recordkeeper, while others used different high-quality, national recordkeepers that were capable of providing services to the Plan. *Id*. Indeed, Plaintiffs engage in apples-to-apples comparisons of fees paid on a per participant basis, which is the way RK&A fees are evaluated by competent fiduciaries. CAC at ¶¶ 56-60. The fact that each of the other similarly-sized plans were receiving **at least** the same services for less provides exactly the circumstantial evidence sufficient to create an inference of imprudence. *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 332 (3d Cir. 2019) (citing *Tussey v. ABB, Inc*., 746 F.3d 327, 336 (8th Cir. 2014) ("finding fiduciaries breached their duties by '[failing to] (1) calculate the amount the Plan was paying [the recordkeeper] for recordkeeping through revenue sharing, (2) determine whether [the recordkeeper's] pricing was competitive, [or] (3) adequately leverage the Plan's size to reduce fees,' among other things.").

Defendants also argue that Plaintiffs do not provide appropriate comparators, stating that Plaintiffs compare Univar's Plan to "plans ranging from fewer than 5,000 participants to almost double that size and providing no allegations as to the plans' assets." Memo. at 6. Contrary to this assertion, as alleged in the Complaint, the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. CAC at ¶ 41. Similarly, the average cost to a recordkeeper of providing services to a participant does not hinge on that participant's account

balance. *Id*. at ¶ 44. Thus, the Plan should have been able to achieve lower RK&A fees that other plans with a similar number of participants achieved, regardless of the plan's total assets.

Furthermore, any minor variation in the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services. *Id.* A plan with 5,300 participants and a plan with 8,000 participants would effectively receive the same package of RK&A services and fees.[2] Plaintiffs have also alleged that comparable plans of all sizes -- larger and smaller than the Plan -- were able to achieve lower RK&A fees. *Id*. at ¶¶ 54-59. These circumstantial facts indicate that Defendants' fiduciary process was deficient because, despite the Plan's size and leverage, the Plan paid between 129% and 195% more than smaller comparator plans. CAC at ¶ 56.

### 2. Plaintiffs Plausibly Allege Numerous Issues with the Active Suite, Including Its High Investment Management Fees

Defendants deliberately misconstrue Plaintiffs' allegations regarding the Active Suite's high investment management fees, suggesting that Plaintiffs claim that such high management fees alone rendered the decision to retain the Active Suite imprudent. Memo. at 7. As detailed in the Complaint, however, Plaintiffs don't merely argue that the difference in fees alone substantiate the fiduciary breach, but rather that the risk profile and expectation of return of the Plan's investments did not and do not warrant the significantly more expensive fees charged to participants. CAC at ¶¶ 64-69, 73-82. Plaintiffs do not suggest that a fiduciary must always offer the cheapest funds available, but rather that, given the information available to Defendants at the time of their decisions to select and retain the investments at issue, they imprudently

---

[2]Compare, for example, the RK&A fees of **$42** per participant for The Boston Consulting Group, Inc. Employees' Savings Plan and Profit Sharing Retirement Fund with 8,067 participants and **$43** per participant for the Bausch Health Companies Inc. Retirement Savings Plan of 8,902 participants, with the Plan's **$76** per participant for a plan of 5,374 participants. CAC at ¶ 56.

8

caused the Plan to pay excessive fees. The authorities cited by Defendants do not address this point, instead attacking a strawman of their creation which does not appear in the Complaint, and are therefore inapposite.[3]

Defendants' argument regarding Plaintiffs' comparison of the Active Suite to the Index Suite is similarly flawed. Defendants argue that plaintiffs making fee comparisons must identify funds with similarities such as "the same management approaches, investment strategies, indices, styles, and risk-and-reward profiles." Memo. at 7 (citing *Davis v. Washington*, 960 F.3d 478, 484–87 (8th Cir. 2020)). However, Defendants' "apples-to-oranges" rhetoric focuses too myopically on the few differences between the Active and Index Suites, rather than the substantial similarities. Memo. at 7. The Active and Index Suite are both TDFs and share, *inter alia*, the same investment management team and nearly identical glide paths (which are derived from the same investment philosophy).[4] CAC at ¶ 64. These are not just "some similarities."

Further demonstrating the weakness of Defendants' position, the majority of district courts across the country have rejected Defendants' arguments regarding the suitability of the Index Suite as a comparator to Active Suite in similar cases. *See e.g., In re Biogen, Inc. ERISA Litig.*, No. 20-CV-11325-DJC, 2021 WL 3116331, at *6 (D. Mass. July 22, 2021) ("Disputes over the appropriateness of these benchmarks, however, are inappropriate at the motion to dismiss stage"); *Jones v. Coca-Cola Consol., Inc.*, 2021 WL 1226551 (W.D.N.C. Mar. 31,

---

[3]*See Martin*, 2020 WL 3578022, at *3; *Loomis v. Exelon*, 658 F.3d 667, 670 (7th Cir. 2011) ("But fiduciaries are not required to pick the best performing fund. Nor are they required to pick the lowest-cost fund * * *. The existence of a cheaper fund does not mean that a particular fund is too expensive in the market generally or that it is an otherwise imprudent choice.").

[4]Given these similarities, courts have found analogous allegations "sufficient at the pleading stage to create the inference that the Index Suite could serve as a suitable comparator for the Active Suite." *In re LinkedIn ERISA Litig.*, 2021 WL 5331448 (N.D. Cal. Nov. 16, 2021) (citing *In re: Prime Healthcare ERISA Litig.*, 2021 WL 3076649 (C.D. Cal. July 16, 2021)).

9

2021); *In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *13 (S.D.N.Y. Aug. 2, 2021) ("Fidelity also uses the same name for both suites – "Freedom Funds" – suggesting that both were under the same umbrella of Fidelity investment products… [a]t this stage, plaintiffs' allegations of similarity make it at least plausible that the two suites will be found to be comparable."); *In re MedStar ERISA Litig.*, 2021 WL 391701, at *6 (D. Md. Feb. 4, 2021) ("Courts have specifically held that the determination of the appropriate benchmark for a fund is not a question properly resolved at the motion to dismiss stage.").[5]

Finally, the fact that Defendants eventually replaced the Active Suite with the FIAM Index Target Date Commingled Pools is hardly proof of "proactive changes over time," as Defendants assert. Belated replacement of an imprudent investment does not absolve fiduciaries of their failure to do so earlier. *See Tibble*, 135 S.Ct. at 1828. Indeed, the Complaint alleges facts which suggest Defendants should have been aware of the Active Suite's numerous red flags far earlier than 2019. CAC at ¶¶ 80-82. Defendants only replaced the Active Suite after ignoring warning signs for years, causing Plan participants to miss out on the greater appreciation generated by other prudent alternative TDFs.

### 3. Defendants' Continued Retention of the Active Suite Supports the Inference that They Breached Their Fiduciary Duties

Rather than addressing Plaintiffs' factual averments regarding the Active Suite's underperformance, Defendants instead suggest that the Complaint is focused on outcomes, rather than process, relying on the benefit of hindsight. Memo. at 9. In doing so, Defendants

---

[5] Defendants' argument that the fees for the Active Suite are "within the ranges courts have found reasonable when granting motions to dismiss" (Memo. at 8) is similarly unavailing, as the inquiry of whether Defendants breached their fiduciary duty is inherently context-specific. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). The Court should decline Defendants' invitation to create a categorical rule regarding the reasonableness of expense ratios without regard to prevailing conditions specific to the Plan during the Class Period.

demonstrate a fundamental misunderstanding of the nature of Plaintiffs' claims. Plaintiffs do not disagree that the fiduciary duty of care requires prudence rather than prescience, or that claims for breach of fiduciary duty are premised upon factual allegations that defendants improperly acted in disregard of prevailing conditions. Indeed, this premise is the backbone of Plaintiffs' claims that the Active Suite's continued underperformance at the start of the Class Period relative to its apt comparators (identifiable in real time) should have led Defendants to investigate the continued prudence of retaining the Active Suite and removed the funds.

Defendants attempt to mischaracterize Plaintiffs' contentions regarding the unsuitability of the Active Suite as an investment option for the Plan as an argument that actively-managed funds are *per se* imprudent. Rather, Plaintiffs only and specifically contend that the Active Suite *specifically* was not appropriate for the Plan during the Class Period. CAC at ¶¶ 67-76. Defendants also pin their argument to the few periods where the Active Suite outperformed competitors, suggesting that this somehow shows that the retention of the funds was prudent, and note that the criticisms of the Active Suite by industry experts alleged in the Complaint occurred before the Class Period. Memo. at 9-10. However, Plaintiffs allege multiple indicia of the Active Suite's unsuitability for the Plan, including, *inter alia*, the facts that the Active Suite's three- and five-year annualized returns underperformed its competitors as of the start of and throughout the Class Period and that the $5.4 billion in outflows from the Active Suite in 2018. CAC at ¶¶ 79, 81-82. The fact that industry criticisms of the Active Suite were available to Defendants before the Class Period actually **bolsters** Plaintiffs' claims. Defendants cannot credibly argue that the eventual removal of the Active Suite in *2019* is "proactive" (Memo. at 12), while acknowledging Defendants failed to consider the industry criticisms of the Active Suite available **before the Class Period**, which would have been sufficient to put any reasonably

11

prudent fiduciary on notice of the Active Suite's unsuitability for inclusion in the Plan investment menu. Similarly, investors' continued use of the Active Suite in 2018 (particularly given the funds' incumbency advantage) does not in any way excuse Defendants' failure to react to the significant red flags pertaining to the Active Suite during the Class Period. Defendants' failure to react to real-time warning signs, including significant net asset outflows, is sufficient to infer imprudence. *Martin*, 2020 WL 3578022, at *5 (citing *Sweda*, 923 F.3d at 324).

Defendants also take issue with Plaintiffs' comparison of the Active Suite to four of the largest non-Fidelity managers in the TDF marketplace.[6] Memo. at 10. Contrary to Defendants' assertions, Plaintiffs do not allege that failure to select the best-performing fund, or even a better-performing fund, automatically constitutes a fiduciary breach. Nor do Plaintiffs suggest that a fiduciary must "reflexively jettison investment options in favor of the prior year's top performers." *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019). Rather, Plaintiffs allege that Defendants, in failing to consider the risk of the Active Suite, its underperformance, and its excessive fees through the Class Period, coupled with the notable capital flight and negative press, ignored warning after warning that the Active Suite was not suitable for Plan participants. While investment losses are not necessarily proof that a fiduciary breached their duty of care, coupled with a thorough pattern of ignoring red flags and undue risk, they are sufficient to create the inference that prudent fiduciary in like circumstances would have acted differently. *Daugherty*, 2017 WL 4227942, at *8. Finally, while ERISA does not require a minimum performance history for investment options, three- and five-year performance

---

[6]Plaintiffs selected the non-Fidelity comparators on the basis that those four TDFs represent the primary offerings of the Freedom Funds' top competitors, which collectively manage nearly 60% of all assets invested in TDFs. Disputes over the appropriateness of these benchmarks, however, are inappropriate at the motion to dismiss stage. *Daugherty*, 2017 WL 4227942, at *8.

comparisons are widely regarded by investment professionals and the investment policy statements of many defined contribution retirement plans as the most important metrics for evaluating whether investment options should be maintained in a retirement plan lineup. CAC at ¶ 32 n.21; *Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *13 (S.D.N.Y. Sept. 27, 2019); *Biogen*, 2021 WL 3116331, at *6; *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1097 (D. Colo. 2020).[7]

### C. Plaintiffs State Claims that Defendants Failed To Monitor Fiduciaries And Co- Fiduciaries, And Engaged In Knowing Breaches Of Trust

When a fiduciary has and exercises the power to appoint and remove plan administrators, it has the duty to monitor those appointees. *Lingis v. Motorola, Inc.*, 649 F. Supp. 2d 861, 881 (N.D. Ill. 2009) (citing *Baker v. Kingsley*, 387 F.3d 649, 663 (7th Cir. 2004)). As alleged in the Complaint, Univar was responsible for appointing and removing plan administrators; however, Univar failed to adequately monitor the Plan fiduciaries and the performance of Plan investment. CAC at ¶¶ 16, 107-115. Defendants argue that Plaintiffs' allegations fail to state a claim for a duty to monitor claim, based on Defendants' mistaken view that Plaintiffs have failed to state a breach of fiduciary duty claim. As already discussed, Defendants are incorrect. *See supra* Section II.B. Defendants' only other argument on this point is that the duty to monitor requires monitoring at reasonable intervals, rather than a review of all business decisions. Memo. at 13-14. This fails to acknowledge that, while the discharge of a fiduciary's monitoring duties does

---

[7]Defendants halfheartedly attack Plaintiffs' breach of loyalty claim. Memo. at 12-13. Their argument ignores Plaintiffs' allegations regarding Defendants' retention of the Active Suite, use of high-cost share classes, and failure to monitor fees enabled Fidelity to collect its inflated compensation from participants. CAC at ¶¶ 51-60. Courts routinely decline to dismiss disloyalty claims where the factual allegations are, as here, tied to the prudence claims because discovery of the shared facts would resolve both claims. *See, e.g., Kruger*, 131 F. Supp. 3d at 474-80*; Morin v. Essentia Health*, 2017 WL 4876281, at *1 (D. Minn. Oct. 27, 2017) (citing *Tussey*, 746 F.3d at 335; *Braden*, 588 F.3d at 595).

not require the review of all business decisions, "[a] plaintiff may bring a claim for breach of duty of prudence if a trustee fails to monitor a plan's investment and respond to changes in circumstances to protect the interests of participants." *Godfrey v. GreatBanc Tr. Co.*, 2020 WL 4815906, at *10 (N.D. Ill. Aug. 19, 2020) (citing *Armstrong v. LaSalle Bank Nat. Ass'n*, 446 F.3d 728, 732 (7th Cir. 2006)).[8] The Seventh Circuit has held that a "trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent." *Armstrong*, 446 F.3d at 734. Plaintiffs allege exactly that, pointing to Defendants' failure to react to the consistent underperformance and increased risk of the Active Suite, particularly in the aftermath of the Active Suite's strategic overhaul. CAC at ¶¶ 75-82.

Defendants briefly argue that Plaintiffs' alternative participation claim for non-fiduciaries should be dismissed because there are no allegations of specific conduct or knowledge by Defendants in a non-fiduciary capacity. Memo. at 14. However, the facts alleged in the Complaint clearly establish that Defendants possessed the requisite knowledge and information to avoid fiduciary breaches at issue here and knowingly participated in (or egregiously disregarded) breaches of fiduciary duty by permitting the Plan to offer a menu of unsuitable and expensive investment options. CAC at ¶¶ 14-17, 59-60, 62-66, 82, 107-115.

### D. Plaintiffs Have Standing to Challenge Funds In Which They Did Not Personally Invest and Seek Prospective Injunctive Relief

Finally, Defendants' argument regarding standing, Memo. at 14-15, ignores the fundamental character of ERISA breach of fiduciary duty claims; particularly, that a suit under

---

[8] Both of the cases cited by Defendants involved summary judgment determinations, with the benefit of evidence compiled in discovery and expert testimony, neither of which are available at this procedural stage. *See generally Fish v. Greatbanc Trust Co.*, 2016 WL 5923448 (N.D. Ill. Sept. 1, 2016); *Howell v. Motorola, Inc.*, 633 F.3d 552 (7th Cir. 2011).

29 U.S.C. §1132(a)(2) is "brought in a representative capacity on behalf of the plan as a whole," and remedies under §1109 "protect the entire plan." *Braden v. Wal-Mart, Inc*., 588 F.3d 585, 593 (8th Cir. 2009). Plaintiffs allege personal injury in fact with respect to the Active Suite and the Plan's RK&A and investment management fees. CAC at ¶¶ 9-13, 21. Defendants claim that Plaintiffs have not demonstrated an injury in fact for every single fund in the Active Suite, and, therefore, cannot establish standing with regard to the funds in which they were not invested, relying on *Brown-Davis v. Walgreen Co.*, 2020 WL 8921399, at *3 (N.D. Ill. March 16, 2020). Memo. at 14. However, in *Cutrone v. Allstate Corp.*, the court explicitly rejected the reasoning of the *Walgreen* court, noting "that the breaches of duty may have impaired the value of other funds does not mean that the plaintiffs have no stake in the duty breach - they do, because they were allegedly harmed by the same breach." 2021 WL 4439415, at *5 (N.D. Ill. Sept. 28, 2021). "[B]ecause each [P]laintiff here has alleged Article III standing, they may seek relief on behalf of the [P]lan or other participants, even when relief sweeps beyond their own injury." *Id.*; *see also Peters v. Aetna Inc*., 2 F.4th 199, 221 (4th Cir. 2021); *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 593 (8th Cir. 2009); *Fallick v. Nationwide Mut. Ins. Co*., 162 F.3d 410, 423 (6th Cir. 1998).[9]

## III. CONCLUSION

The Court should deny Defendants' Motion to Dismiss in its entirety.[10]

---

[9] This standing analysis applies equally to claims for injunctive relief, as plaintiffs in an ERISA case may seek relief on behalf of **the entire plan**, even if they themselves will not personally benefit from some of the relief sought. *See Braden*, 588 F.3d at 593 (holding participants can assert claims on behalf of "the entire Plan" to "seek relief . . . that sweeps beyond [their] own injury"). As explained above, Plaintiffs allege personal injury in fact and, thus, have sufficiently alleged standing to bring each of their claims on behalf of the Plan and proposed class. CAC at ¶¶ 9-13, 21; *Cutrone,* 2021 WL 4439415 at *5.

[10] Should the Court find the claims and allegations against Defendants deficient in any manner, Plaintiffs respectfully request leave to amend to cure any such deficiencies. Leave to amend should be "freely given when justice so requires" under Fed. R. Civ. P. 15(a). *Foman v. Davis*, 371 U.S. 178, 182 (1962).

15

Dated: April 26, 2022        Respectfully submitted,

*/s/ P. Andrew Fleming*
P. Andrew Fleming
Andrew P. Shelby
Novack and Macey LLP
100 North Riverside Plaza
Chicago, IL 60606
Telephone: (312) 516-5610
Facsimile: (312) 419-6928
Email: andrewf@novackmacey.com
      ashelby@novackmacey.com

James E. Miller
Laurie Rubinow
Miller Shah LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
      lrubinow@millershah.com

James C. Shah
Alec J. Berin
John C. Roberts
Miller Shah LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
      ajberin@millershah.com
      jcroberts@millershah.com

Kolin C. Tang
Miller Shah LLP
19712 MacArthur Blvd.
Irvine, CA 92612
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: kctang@millershah.com

---

Plaintiffs stand ready to add further allegations regarding the defects in Defendants' investment and service provider selection and monitoring processes should the Court require it.

                                    Mark K. Gyandoh
                                    Gabrielle Kelerchian
                                    Capozzi Adler, P.C.
                                    312 Old Lancaster Road
                                    Merion Station, PA 19066
                                    Telephone: (610) 890-0200
                                    Facsimile: (717) 233-4103
                                    Email: markg@capozziadler.com
                                                    gabriellek@capozziadler.com

                                  Donald R. Reavey
                                    Capozzi Adler, P.C.
                                    2933 North Front Street
                                    Harrisburg, PA 17110
                                    Telephone: (717) 233-4101
                                    Facsimile: (717) 233-4103
                                    Email: donr@capozziadler.com

                                  *Attorneys for Plaintiffs, the Plan*
                                  *and the Proposed Class*

## **CERTIFICATE OF SERVICE**

Pursuant to Rule 5 of the Federal Rules of Civil Procedure and Rule 5.5 of the Local Rules of the Northern District of Illinois, I hereby certify that on April 26, 2022 a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: */s/ P. Andrew Fleming*
P. Andrew Fleming