**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

TODD COYER, KARL KISNER,
LAURYN OVERBEY, LISA SOLOMON,
and SONNY PIKE, Individually and as
representatives of a class of similarly
situated persons, on behalf of the UNIVAR
SOLUTIONS 401(K) PLAN f/k/a the
UNIVAR USA INC. VALUED
INVESTMENT PLAN,

                    Plaintiffs,

          v.

UNIVAR SOLUTIONS USA INC., THE
BOARD OF DIRECTORS OF UNIVAR
SOLUTIONS USA INC., THE RETIREMENT
PLAN COMMITTEE OF UNIVAR
SOLUTIONS USA INC.; and DOES No. 1-20,
Whose Names Are Currently Unknown,

                    Defendants.

Case No: 1:22-cv-00362


**AMENDED CLASS ACTION
COMPLAINT**

## I.      INTRODUCTION

1.      Plaintiffs, Todd Coyer ("Coyer"), Karl Kisner ("Kisner"), Lauryn Overbey

("Overbey"), Lisa Solomon ("Solomon"), and Sonny Pike ("Pike") (collectively, "Plaintiffs"),

individually and as participants of the Univar Solutions 401(k) Plan f/k/a the Univar USA Inc.

Valued Investment Plan ("Plan"), bring this action under 29 U.S.C. § 1132, on behalf of the Plan

and a class of similarly-situated participants and beneficiaries of the Plan, against Defendants,

Univar Solutions USA Inc. ("Univar"), the Board of Directors of Univar Solutions USA Inc.

("Board"), the Retirement Plan Committee of Univar Solutions USA Inc. ("Administrative

Committee" or "Committee"), and Does No. 1-20, who are members of the Administrative

Committee or the Board or other fiduciaries of the Plan and whose names are currently unknown

(collectively, "Defendants"), for breach of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*., and related breaches of applicable law beginning six years prior to the date this action is filed and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just ("Class Period").[1]

2.     Defined contribution plans (e.g., 401(k) and 403(b) plans) that are qualified as tax-deferred vehicles have become the primary form of retirement saving in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) and 403(b) plans operate in a manner in which participants bear the risk of high fees and investment underperformance.

3.     The importance of defined contribution plans to the United States retirement system has become pronounced as employer-provided defined benefit plans have become increasingly rare as an offered and meaningful employee benefit.

4.     As of December 31, 2020, the Plan had 7,449 participants with account balances and assets totaling approximately $978 million, placing it in the top 0.2% of all 401(k) plans by plan size.[2]  Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of 401(k) plans and the investment of 401(k) assets.  The marketplace for 401(k) retirement plan services is well-established and can be

---

[1] Plaintiffs file this Amended Complaint at the Court's direction to conform with the Court's Memorandum Opinion and Order dated September 29, 2022 (ECF No. 38), but do not intend to waive, and expressly reserve, their right to appeal all dismissed claims.  In addition, Plaintiffs intend to file a motion for entry of final judgment on the dismissed claims pursuant to Federal Rule of Civil Procedure 54(b) shortly after the filing of this Amended Complaint.
[2] The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 (pub. July 2021).

competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5.    Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services.  Defendants are fiduciaries under ERISA, and, as such, owe a series of duties to the Plan and its participants and beneficiaries, including obligations to act for the exclusive benefit of participants, ensure that the investment options offered through the Plan are prudent and diverse, and ensure that Plan expenses are fair and reasonable.

6.    Defendants have breached their fiduciary duties to the Plan.  As detailed below, Defendants: (1) failed to fully disclose the expenses and risk of the Plan's investment options to participants; (2) allowed unreasonable expenses to be charged to participants; and (3) selected, retained, and/or otherwise ratified high-cost and poorly-performing investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time Defendants selected and retained the funds at issue and throughout the Class Period.

7.    To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under Sections 404, 409 and 502 of ERISA, 29 U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class ("Class") as the Court may deem appropriate and just under all of the circumstances.

8.    Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

    a.    A declaratory judgment holding that the acts of Defendants described
        herein violate ERISA and applicable law;

      b.      A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

      c.      Equitable, legal or remedial relief for all losses and/or compensatory damages;

      d.      Attorneys' fees, costs and other recoverable expenses of litigation; and

      e.      Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.    THE PARTIES

9.      Coyer is a former employee of Univar and former participant in the Plan under 29 U.S.C. § 1002(7). During the Class Period, Coyer maintained an investment through the Plan in the Dodge & Cox Income Fund, the T. Rowe Price New Horizons Fund, the Mercer Small/Mid Cap Stock Collective Investment Trust ("CIT"), the Mercer Diversified Bond CIT, the Mercer Large Cap Stock CIT, the Mercer International Stock CIT, the Delaware Small Cap Value Fund, the LSV Value Equity Fund, the State Street Global All Cap Equity ex-U.S. Index CIT, the State Street Real Asset CIT, the State Street Russell Small/Mid Cap Index CIT, the State Street S&P 500 Index CIT, the State Street U.S. Bond Index CIT, the Invesco Stable Value CIT, the Fidelity Managed Income Portfolio, the Fidelity Diversified International Fund, the Fidelity Growth Company Fund, the Fidelity Low-Priced Stock Fund, the Fidelity U.S. Bond Index Fund, the Fidelity 500 Index Fund, the Fidelity International Index Fund, and the Fidelity Extended Market Index Fund and was subject to the excessive recordkeeping and administrative costs alleged below. Coyer is a resident of Lawrence, New Jersey.

-4-

10.     Kisner is a former employee of Univar and former participant in the Plan under 29 U.S.C. § 1002(7). During the Class Period, Kisner maintained an investment through the Plan in the Fidelity Freedom 2010 Fund, the Fidelity Freedom 2020 Fund, the Fidelity Freedom 2030 Fund, the Fidelity Freedom 2040 Fund, the Fidelity Freedom 2050 Fund, and the FIAM Index Target Date 2035 Commingled Pool and was subject to the excessive recordkeeping and administrative costs alleged below. Kisner is a resident of Pflugerville, Texas.

11.     Overbey is a former employee of Univar and former participant in the Plan under 29 U.S.C. § 1002(7). During the Class Period, Overbey maintained an investment through the Plan in the Dodge & Cox Income Fund, the T. Rowe Price New Horizons Fund, the Mercer Small/Mid Cap Stock CIT, the Mercer Diversified Bond CIT, the Mercer Large Cap Stock CIT, the Mercer International Stock CIT, the Delaware Small Cap Value Fund, the LSV Value Equity Fund, the State Street Global All Cap Equity ex-U.S. Index CIT, the State Street S&P 500 Index CIT, the State Street U.S. Bond Index CIT, the Invesco Stable Value CIT, the Fidelity Managed Income Portfolio, the Fidelity Diversified International Fund, the Fidelity Growth Company Fund, the Fidelity Low-Priced Stock Fund, the Fidelity U.S. Bond Index Fund, the Fidelity 500 Index Fund, the Fidelity International Index Fund, the Fidelity Extended Market Index Fund, the Fidelity Freedom Income Fund, the Fidelity Freedom 2025 Fund, the Fidelity Freedom 2030 Fund, the Fidelity Freedom 2035 Fund, the Fidelity Freedom 2040 Fund, the Fidelity Freedom 2045 Fund, the Fidelity Freedom 2050 Fund, the Fidelity Freedom 2055 Fund, and the Fidelity Freedom 2060 Fund and was subject to the excessive recordkeeping and administrative costs alleged below. Overbey is a resident of Chicago, Illinois.

12.     Solomon is a former employee of Univar and former participant in the Plan under 29 U.S.C. § 1002(7). During the Class Period, Solomon maintained an investment through the

Plan in the T. Rowe Price New Horizons Fund, the Fidelity Managed Income Portfolio, the Fidelity Freedom 2010 Fund, Mercer Small/Mid Cap Stock CIT, the Invesco Stable Value CIT, and the FIAM Index Target Date 2010 Commingled Pool and was subject to the excessive recordkeeping and administrative costs alleged below. Solomon is a resident of Cincinnati, Ohio.

13.    Pike is a former employee of Univar and former participant in the Plan under 29 U.S.C. § 1002(7). During the Class Period, Pike maintained investments through the Plan in the Fidelity Freedom 2030 Fund and Fidelity Freedom 2035 Fund and was subject to the excessive recordkeeping and administrative costs alleged below. Pike is a resident of Fife, Washington.

14.    Univar is a public Delaware corporation headquartered in Downers Grove, Illinois. Univar is a global chemical and ingredients distributor and provider of value-added services.

15.    The Board appointed "authorized representatives" of Univar, including the Administrative Committee, as plan fiduciaries. Does No. 1-10 are members of the Board who were/are fiduciaries of the Plan under ERISA pursuant to 29 U.S.C. §§ 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Administrative Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

16.    The Administrative Committee is the Plan Administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102. The Administrative Committee maintains its address at Univar's corporate headquarters in Downers Grove, Illinois. The Administrative Committee and its members are appointed by Univar or its delegate to administer the Plan on Univar's behalf.

17.     Does No. 11-20 are the members of the Administrative Committee and, by virtue of their membership, fiduciaries of the Plan or otherwise are fiduciaries to the Plan.  Plaintiffs are currently unable to determine the membership of the Administrative Committee or the identity of the other fiduciaries of the Plan because, despite reasonable and diligent efforts, it appears that the membership of the Administrative Committee and the identity of any other fiduciaries is not publicly available.  As such, these Defendants are named Does as placeholders.  Plaintiffs will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint to name the members of the Administrative Committee, the members of the Board, and other responsible individuals as defendants as soon as their identities are discovered.

### III.     JURISDICTION AND VENUE

18.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

20.      Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Univar's principal place of business is in this District and the Plan is administered from this judicial district.  Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

21.     Plaintiffs have standing to bring this action.  Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary

breaches and remains vulnerable to continuing harm, all redressable by this Court. In addition, although standing under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and excessive fees, and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

## IV.    FACTUAL ALLEGATIONS

### A.    Background and Plan Structure

22.    The Plan is a participant-directed 401(k) plan, in which participants direct the investment of their contributions into various investment options offered by the Plan. Each participant's account is credited with the participant contributions, employer matching contributions, any discretionary contributions, and earnings or losses thereon. The Plan pays Plan expenses from Plan assets, and the majority of administrative expenses are paid by participants as a reduction of investment income. Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses. The available investment options for participants of the Plan include various CITs. Prior to the switch to an all-CIT lineup in 2019, the Plan investment menu included various mutual funds and a CIT.

23.    Mutual funds are publicly-traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities. Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the U.S. Securities and Exchange Commission ("SEC"). Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

24.     CITs are, in essence, mutual funds without the SEC regulation.  CITs fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments.  CITs were first organized under state law in 1927 and were blamed for the market crash in 1929.  As a result, collective trusts were severely restricted, giving rise to the more transparent and publicly-traded mutual funds.  Today, banks create collective trusts only for their trust clients and for employee benefit plans, like the Plan.  The main advantage of opting for a collective trust, rather than a mutual fund, is the negotiability of the fees, so that larger retirement plans should be able to leverage their size for lower fees.

25.     During the Class Period, Plan assets were held in a trust by the Plan Trustee, Fidelity Management Trust Company.  All investments and asset allocations are performed through this trust instrument.

**B.      The Defined Contribution Industry**

26.     Failures by ERISA fiduciaries to monitor fees and costs for reasonableness, such as those identified herein, have stark financial consequences for retirees.  Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.  Over time, even small differences in fees compound and can result in vast differences in the amount of a participant's savings available at retirement.  As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan."  *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).

27.     The impact of excessive fees on a plan's employees' and retirees' retirement assets is dramatic.  The U.S. Department of Labor ("DOL") has noted that a 1% higher level of

-9-

fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career.[3]

28.    Plan participants typically have little appreciation of the fees being assessed to their accounts. Indeed, according to a 2017 survey conducted by TD Ameritrade, only 27% of investors believed they knew how much they were paying in fees as participants in defined contribution plans, and 37% were unaware that they paid defined contribution fees at all.[4] It is incumbent upon plan fiduciaries to act for the exclusive best interest of plan participants, protect their retirement dollars, and ensure that fees are and remain reasonable for the services provided and properly and fully disclosed. Unfortunately, fiduciaries of defined contribution retirement plans, including large retirement plans like the Plan, also often lack understanding of the fees being charged to the plans that they administer, manage and control.

**C.    Recordkeeping and Administrative Services**

29.    Fiduciaries of virtually all large defined contribution plans, including the Plan, hire a single provider to provide the essential recordkeeping and administrative ("RK&A") services for the plan. These services include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services.

30.    The term "recordkeeping" is a catchall term for the entire suite of recordkeeping and administrative services typically provided by a plan's service provider or "recordkeeper" –

---

[3]*A Look at 401(k) Plan Fees*, UNITED STATES DEPT. OF LABOR at 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/a-look-at-401k-plan-fees.pdf (last visited January 3, 2022).

[4]*See* https://s2.q4cdn.com/437609071/files/doc_news/research/2018/Investor-Sentiment-Infographic-401k-fees.pdf (last visited January 3, 2022).

that is recordkeeping fees and RK&A fees are one and the same and the terms are used synonymously.

31.     Recordkeepers typically collect their fees in two forms, respectively referred to as "direct" compensation and "indirect" compensation.

32.     Direct compensation is paid directly from plan assets and reflected as a deduction in the value of participant accounts.

33.     Indirect Compensation is paid to the recordkeeper indirectly by third parties and is not transparent to retirement plan participants.  In other words, the fees are taken from the investment options prior to the value of the investment option being provided to the participant. Thus, in most cases, participants are not aware that they are paying these fees.  Most indirect compensation is typically collected by recordkeepers through asset-based "revenue sharing."

34.     Virtually all recordkeepers are subsidiaries or affiliates of financial services and insurance companies that also provide investment options to defined contribution plans, (*e.g.*, mutual funds, insurance products, collective trusts, separate accounts, *etc.*), or have some other ancillary line of business (*e.g.*, consulting) to sell to plans.  As a result, all recordkeepers consider the economic benefit of their entire relationship with a defined contribution plan when setting fees for the RK&A services.  Simply put, discounts in the RK&A fee rate are often available based on revenues the recordkeeper earns through the provision of other services (*e.g.*, investment management revenues).  In many cases, the additional investment management revenues are more than double or triple the revenue earned by the recordkeeper for providing RK&A services.

35.     There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan).  First, an overall

suite of recordkeeping services is provided to large plans as part of a "bundled" arrangement for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

    i.    Recordkeeping;

    ii.    Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

    iii.    Administrative services related to converting a plan from one recordkeeper to another;

    iv.    Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

    v.    Maintenance of an employer stock fund (if needed);

    vi.    Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

    vii.    Plan consulting services, including assistance in selecting the investment lineup offered to participants;

    viii.    Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[5] (excluding the separate fee charged by an independent third-party auditor);

    ix.    Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements

---

[5]The Form 5500 is the annual report that defined contribution plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

and the provisions of the plan (excluding separate legal services provided by a

third-party law firm); and

  x.  Compliance testing to ensure the plan complies with U.S. Internal Revenue

Service nondiscrimination rules.

  36.  This suite of essential RK&A services can be referred to as "Bundled RK&A"

services. These services are offered by all recordkeepers for one price (typically at a per capita

price), regardless of the services chosen or utilized by the plan. Anyone who has passing

familiarity with recordkeepers' responses to requests for proposals, their bids and their contracts

understands and appreciates that the services chosen by a large plan do not affect the amount

charged by recordkeepers for such basic and fungible services and any claim by Defendants that

recordkeeping expenses depend upon the service level provided to a plan with respect to the

above services is both false and frivolous. Nonetheless, as is all too often the case, fiduciary-

defendants often disingenuously assert that the cost of Bundled RK&A services depend upon

service level (even though such an assertion is plainly untrue based upon the actual marketplace

for such services), as part of attempt to perpetuate misunderstanding by the less informed in

order to stave off breach of fiduciary duty claims.

  37.  The second type of essential RK&A services, hereafter referred to as "A La Carte

RK&A" services, provided by all national recordkeepers, often has separate, additional fees

based on the conduct of individual participants and the usage of the services by individual

participants. These fees are distinct from the Bundled RK&A arrangement to ensure that one

participant is not forced to help another cover the cost of, for example, taking a loan from their

plan account balance. These A La Carte RK&A services typically include, but are not limited to,

the following:

     i.        Loan processing;

     ii.       Brokerage services/account maintenance (if offered by the plan);

     iii.      Distribution services; and

     iv.      Processing of qualified domestic relations orders.

38.    All national recordkeepers have the capability to provide all of the aforementioned RK&A services to all large defined contribution plans, including those much smaller than the Plan.

39.    For large plans with greater than 5,000 participants, any minor variations in the way that these essential RK&A services are delivered have no material impact on the fees charged by recordkeepers to deliver the services. That fact is confirmed by the practice of all recordkeepers quoting fees for the Bundled RK&A services on a per-participant basis without regard for any individual differences in services requested—which are treated by recordkeepers as immaterial because they are, in fact, inconsequential to recordkeepers from a cost perspective.

40.    While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, they all actually offer the same bundles and combinations of services as their competitors. Accordingly, the market for defined contribution plan RK&A services has become increasingly price competitive, particularly for larger plans that, like the Plan, have a considerable number of participants and significant assets.

41.    The marginal cost of adding an additional participant to a recordkeeping platform is relatively low.  These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans, including the Plan.  As a plan's participant count increases, the recordkeeper's fixed costs of providing RK&A services are spread over a larger population, thereby reducing the average unit cost of delivering services on a per-participant basis.

42.     Due to these economies of scale that are part of a recordkeeping relationship, and because the incremental variable costs for providing RK&A are dependent on the number of participants with account balances in a defined contribution plan, the cost to the recordkeeper on a per-participant basis declines as the number of plan participants increases and, as a result, a recordkeeper is willing to accept a lower fee to provide RK&A as the number of participants in the plan increases.

43.     As a result, it is axiomatic in the retirement plan services industry that, all else being equal: (1) a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis; and (2) that as participant counts increase, the effective per-participant RK&A fee should decrease, assuming the same services are provided.

44.     Similarly, the average cost to a recordkeeper of providing services to a participant does not hinge on that participant's account balance.  In other words, it costs a recordkeeper the same amount to provide services to a participant with an account balance of $10,000 as it does to provide services to a participant with a balance of $1,000,000.

45.     Informed, prudent plan fiduciaries are aware of these cost structure dynamics. Understanding these marketplace realities and facts, prudent fiduciaries of large plans (like the Plan) will leverage the plan's participant count to obtain lower effective per-participant fees.

46.     Because recordkeeping fees are actually paid in dollars, prudent fiduciaries evaluate the fees for RK&A services on a dollar-per-participant basis.  This is the current standard of care for ERISA fiduciaries and has been throughout the Class Period.

47.     Prudent fiduciaries will regularly ensure that a plan is paying fees commensurate with its size in the marketplace by soliciting competitive bids from recordkeepers other than the

plan's current provider.  Recognizing that RK&A services are essentially uniform in nature, and that small differences in the services required by a large plan are immaterial to the cost of providing such services, most recordkeepers only require a plan's participant count and asset level in order to provide a fee quote.  These quotes are typically provided on a per-participant basis, enabling fiduciaries to easily compare quotes on an apples-to-apples basis to determine if the current level of fees being charged by a plan's recordkeeper is reasonable.

48.     Once a prudent fiduciary has received quotes, if necessary, the fiduciary can then negotiate with the plan's current provider for a lower fee or move to a new provider to provide the same (or better) services for a competitive (or lower) reasonable fee.  This is because prudent fiduciaries understand that excessive fees significantly and detrimentally impact the value of participants' retirement accounts.

49.     After negotiating the fee to be paid to the recordkeeper and electing to have the plan (*i.e.*, participants) pay that fee, the fiduciaries can allocate the negotiated fees among participant accounts at the negotiated per-participant rate or *pro rata* based on participant account balances, among other less common ways.

**D.**     **Defendants' Breaches of Fiduciary Duties**

50.     As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and/or loyalty to the Plan in several significant ways.  Plaintiffs did not acquire actual knowledge regarding Defendants' breaches at issue here until shortly before this Complaint was filed.

**1.     The Plan's Excessive Recordkeeping/Administrative Costs**

51.     An obvious indicator of Defendants' breaches of their fiduciary duties is the Plan's excessive RK&A costs.  The impact of such high fees on participant balances is

-16-

aggravated by the effect of compounding, to the significant detriment of participants over time. This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



52.     During the Class Period, participants paid Fidelity for RK&A services indirectly through asset-based revenue sharing.  The RK&A services provided to the Plan are and were the same standard services identified above, and those provided to comparable plans.  There are no services provided to the Plan and its participants by Fidelity that are unusual or out of the ordinary.  Regardless, for large plans, like the Plan here, any differences in services are immaterial to pricing considerations, the primary drivers of which are the number of participants and whether the plan fiduciaries employed a competitive process of soliciting bids to determine the reasonable market rate for the services required by the plan.

53.     From the start of the Class Period through at least December 31, 2018,[6] Defendants allowed the Plan to be charged total amounts of RK&A fees that far exceeded the

---

[6]At some point in 2019, Defendants changed nearly the entire Plan investment menu, removing all mutual funds

-17-

reasonable market rate. The table below sets forth the annual amounts per participant the Plan ultimately paid to Fidelity in RK&A fees, per the Plan's Form 5500s.

|  | 2016 | 2017 | 2018 | Average |
|---|---|---|---|---|
| Participant Accounts with a Balance | 5,419 | 5,285 | 5,418 | 5,374 |
| Indirect Compensation | $ 852,712 | $ 979,678 | $ 887,793 | $ 906,728 |
| Administrative Credit to Plan | $ (314,389) | $ (310,483) | $ (474,990) | $ (366,621) |
| Fidelity RK&A Fee ($) | $ 538,323 | $ 669,195 | $ 412,803 | $ 540,107 |
| Fidelity RK&A Fee ($/pp) | $99 | $127 | $76 | $101 |

54.     Given the Plan's size, expected growth, and resulting negotiating power, with prudent management and administration, the Plan should unquestionably have been able to obtain reasonable rates for RK&A services that were significantly lower than the effective per-participant RK&A rates set forth above.

55.     According to publicly available data and information from the Form 5500 filings of similarly sized defined contribution plans during the Class Period, other comparable plans were paying much lower fees than the Plan throughout the Class Period. That is clear and compelling evidence that the reasonable market rate is lower than what the Plan was paying since these comparable plans were able to negotiate lower fees for materially identical services.

56.     The table below lists the RK&A fees paid by similarly sized defined contribution plans, which represent the prices available to the Plan during the Class Period. Some of these plans used Fidelity as their recordkeeper, while others used different high-quality, national recordkeepers. The table also indicates the number of participants and assets of each plan.

---

offered in the Plan and selecting an all-CIT lineup. As there is no publicly available information on the revenue sharing amounts generated by these CITs, Plaintiffs are unable to calculate the amounts remitted to Fidelity from 2019 through the present.

| Plan | Participants | RK&A Fee ($) | RK&A Fee ($/pp) | Recordkeeper |
|---|---|---|---|---|
| Healthfirst Profit Sharing 401(k) Plan | 4,950 | $ 195,488 | $39 | Vanguard |
| Menasha Corporation 401(k) Retirement Savings Plan | 5,198 | $ 307,538 | $59 | Prudential |
| Colas Inc. and Subsidiaries 401(k) Savings Plan | 5,240 | $ 263,068 | $50 | Prudential |
| **Univar Solutions 401(k) Plan Average Fee** | **5,374** | **$ 540,107** | **$101** | **Fidelity** |
| Crowe LLP Retirement Plan | 5,799 | $ 253,117 | $44 | Vanguard |
| Vista Outdoor Inc. 401(k) Plan | 5,937 | $ 330,481 | $56 | Vanguard |
| Smithfield Foods, Inc. Salaried 401(k) Plan | 6,149 | $ 281,303 | $46 | Great West |
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement Fund | 8,067 | $ 336,126 | $42 | Vanguard |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,902 | $ 379,773 | $43 | Fidelity |

57.     The RK&A fees calculated[7] for each similar comparable plan in the table above include all the direct compensation paid to the recordkeeper disclosed on each plan's Form 5500, as well as all indirect compensation.  Specifically, if the plan's pricing structure as described in each plan's Form 5500 reveals that some or all of the revenue sharing is not returned to the plan, then the appropriate amount of revenue sharing is also included to calculate the RK&A fees.  In some cases, the plan's investment options do not contain revenue sharing and, as a result, any indirect revenue is immaterial to the RK&A fees.  In other plans, all of the revenue sharing is returned to the plans and is therefore not included in the fee calculation.

58.     The comparable plans above received at least the same RK&A services received by the Plan for the fees paid.  In other words, the fees in the table above are apples-to-apples comparisons in that they include all the fees being charged by each recordkeeper to provide the same RK&A services to similar defined contribution plans.

---

[7] Fee calculations for the comparable plans are based on the information disclosed in each plan's 2018 Form 5500.

59.     As the table above indicates, the fees paid by the Plan for virtually the same package of services are much higher than those of plans with comparable, and in many cases smaller, participant counts.  Indeed, based on fees paid by other large plans during the Class Period receiving materially identical RK&A services, it is clear and more than reasonable to infer that Defendants failed to follow a prudent process to ensure that the Plan was paying only reasonable fees.  In light of the amounts remitted to Fidelity throughout the Class Period, Defendants clearly engaged in virtually no examination, comparison, or benchmarking of the RK&A fees of the Plan to those of other similarly sized defined contribution plans, or were complicit in paying grossly excessive fees.

60.     Defendants' failure to recognize that the Plan and its participants were grossly overcharged for RK&A services and their failure to take effective remedial actions amounts to a shocking breach of their fiduciary duties to the Plan.  To the extent Defendants had a process in place, it was imprudent and ineffective given the objectively unreasonable level of fees the Plan paid for RK&A services.  Had Defendants appropriately monitored the compensation paid to Fidelity and ensured that participants were only charged reasonable RK&A fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six-plus years.

## IV.     ERISA'S FIDUCIARY STANDARDS

61.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  Section 404(a) of ERISA, 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan
> solely in the interest of the participants and beneficiaries and -
>
> (A)     for the exclusive purpose of

(i)    providing benefits to participants and their beneficiaries; and

(ii)    defraying reasonable expenses of administering the plan;

[and]

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

62.    Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in a plan and their beneficiaries and defraying reasonable expenses of administering the plan.

63.    Under ERISA, parties that exercise any authority or control over plan assets, including the selection of plan investments and service providers, are fiduciaries and must act prudently and solely in the interest of participants in a plan.

64.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982).

65.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. Section 405(a) of ERISA, 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. ERISA states, in relevant part, as follows:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)    if he participates knowingly in, or knowingly

-21-

> undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

> (2) if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

66.     Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under Section 409, 29 U.S.C. § 1109.  Section 409(a) of ERISA provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## V.     CLASS ALLEGATIONS

67.     This action is brought as a class action by Plaintiffs on behalf of themselves and the following proposed Class:

> All participants and beneficiaries in the Univar Solutions 401(k) Plan (the "Plan") at any time on or after January 21, 2016 and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just (the "Class Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

68.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

69.     **Numerosity**.  Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

70.     **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

(a)     Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)     Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)     Whether and what form of relief should be afforded to Plaintiffs and the Class.

71.     **Typicality**.  Plaintiffs, who are members of the Class, have claims that are typical of all of the members of the Class.  Plaintiffs' claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.  In addition, Plaintiff seeks relief for the Plan under the same remedial theories that are applicable as to all other members of the Class.

72.     **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiffs have retained competent

counsel experienced in class action and other complex litigation, including class actions under ERISA.

73.     **Potential Risks and Effects of Separate Actions**.  The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

74.     **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

75.     **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority of, if not all, Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

76. **Manageability**. This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

77. Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above. Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

78. Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure. Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

79. Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

## COUNT I
### (For Breach of Fiduciary Duty)

80. Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

81. Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses

of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan. In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

82.     To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

83.     As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

84.     Pursuant to Sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)

85.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

86.     Univar is responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committee.

87.     In light of its appointment and supervisory authority, Univar had a fiduciary responsibility to monitor the performance of the Committee and its members.  In addition, Univar, and the Administrative Committee had a fiduciary responsibility to monitor the performance of the members of the Committee.

88.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

89.     To the extent that fiduciary monitoring responsibilities of Univar or the Committee was delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

90.     Univar and the Committee breached their fiduciary monitoring duties by, among other things:

>   (a)   Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;
>
>   (b)   Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and
>
>   (c)   Failing to remove appointees whose performances were inadequate in that they

continued to maintain imprudent, excessively costly, and poorly performing

investments within the Plan, all to the detriment of the Plan and its participants'

retirement savings.

91.　　As a consequence of these breaches of the fiduciary duty to monitor, the Plan

suffered substantial losses.  Had Univar and the Committee discharged their fiduciary monitoring

duties prudently as described above, the losses suffered by the Plan would have been minimized

or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the

Plan and its participants have lost millions of dollars of retirement savings.

92.　　Univar and the Committee are liable under 29 U.S.C. § 1109(a) to make good to

the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this

Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other

equitable or remedial relief as appropriate.

93.　　Each of the Defendants also knowingly participated in the breaches of the other

Defendants, knowing that such acts constituted breaches; enabled the other Defendants to

commit breaches by failing to lawfully discharge their own fiduciary duties; and knew of the

breaches by the other Defendants and failed to make any reasonable effort under the

circumstances to remedy the breaches. Defendants, thus, are liable for the losses caused by the

breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### (In the Alternative, Liability for Knowing Breach of Trust)

94.　　Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint

as if fully set forth herein.

95.　　In the alternative, to the extent that any of the Defendants are not deemed a

fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise

subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

96.     To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of imprudent investment options and pay excessive recordkeeping and administrative fees, all of which was unjustifiable in light of the size and characteristics of the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demand judgment against Defendants for the following relief:

(a)     Declaratory and injunctive relief pursuant to Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above;

(b)     Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## <u>NOTICE PURSUANT TO ERISA § 502(h)</u>

To ensure compliance with the requirements of Section 502(h) of ERISA, 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

DATED: October 25, 2022                Respectfully submitted,

                                       /s/ James C. Shah
                                       James C. Shah*
                                       Alec J. Berin*
                                       John C. Roberts*
                                       Miller Shah LLP
                                       1845 Walnut Street, Suite 806
                                       Philadelphia, PA 19103
                                       Telephone: (866) 540-5505
                                       Facsimile: (866) 300-7367
                                       Email: jcshah@millershah.com
                                              ajberin@millershah.com

                                       James E. Miller*
                                       Laurie Rubinow*
                                       Miller Shah LLP
                                       65 Main Street
                                       Chester, CT 06412
                                       Telephone: (866) 540-5505
                                       Facsimile: (866) 300-7367
                                       Email: jemiller@millershah.com
                                              lrubinow@millershah.com

                                       Kolin C. Tang*
                                       Miller Shah LLP
                                       19712 MacArthur Blvd.
                                       Irvine, CA 92612
                                       Telephone: (866) 540-5505
                                       Facsimile: (866) 300-7367
                                       Email: kctang@millershah.com

Mark K. Gyandoh*
Capozzi Adler, P.C.
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: markg@capozziadler.com

Donald R. Reavey*
Capozzi Adler, P.C.
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101
Facsimile: (717) 233-4103
Email: donr@capozziadler.com

P. Andrew Fleming
Andrew P. Shelby
Novack and Macey LLP
100 North Riverside Plaza
Chicago, IL 60606
Telephone: (312) 516-5610
Facsimile: (312) 419-6928
Email: andrewf@novackmacey.com
       ashelby@novackmacey.com

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*

*Admitted *pro hac vice*